In the Matter of the CITY OF NEW YORK, Appellant-Respondent, Relative to Acquiring Title to Real Property for a Project Known as COLLEGE POINT INDUSTRIAL PARK, URBAN RENEWAL PROJECT II. PETER REISS et al., Respondents; LINDEN COUNTRY CLUB et al., Respondents-Appellants.

Second Department, December 22, 1980

242

APPEARANCES OF COUNSEL

*Allen G. Schwartz, Corporation Counsel (Peter A. Mound, Leonard Olarsch* and *Morris Einhorn* of counsel), for appellant-respondent.

*Greco & Gottlieb (Michael J. Greco* and *Robert S. Gottlieb* of counsel), for Linden Country Club, Inc., respondent-appellant.

*Greco & Gottlieb (Michael J. Greco* and *Siff & Newman, P. C.,* of counsel), for William A. Gull, respondent-appellant.

*Searles & Scher, P. C. (Sidney Z. Searles, Julius L. Sackman* and *Theodore S. Lite* of counsel), for Flushing Metal & Paper Corporation, respondent.

*Samuel Goldstein & Sons (Arthur D. Goldstein* of counsel), for Peter Reiss and another, respondents.

*Reavis & McGrath (Reginald S. Hardy* and *Douglas P. Catalano* of counsel), for E. H. Malone and others, respondents.

*Greco & Gottlieb (Michael J. Greco* and *Robert S. Gottlieb* of counsel), for Wilkinson & Wilkinson and others, respondents.

*Greco & Gottlieb (Michael J. Greco* of counsel), for Mileau Corporation, respondent.

### OPINION OF THE COURT

TITONE, J.

In this condemnation proceeding, the City of New York acquired title to certain real property for a project known as the College Point Industrial Park, Urban Renewal Project II. The taking included 318 separate damage parcels, some of which were already owned by the city, but which were included in the proceeding for the purpose of extinguishing any possible liens on these properties. Title vested in the city on December 1, 1972.

The properties involved herein are zoned for industrial use. Most of the parcels were actually used for automobile salvage businesses and for storage of contractors' equipment, motor vehicles, and various other materials. Some of the parcels were vacant and unused. There were also two beach clubs, several gasoline stations, an amusement park and several private dwellings. The properties are strategically situated near major arteries and thoroughfares of the city, making them ideal for industrial use. The land is, however, burdened with poor subsurface conditions, such as would require piling and landfill before any buildings could be constructed thereupon. Some of the land is also burdened in varying degrees with the waters of Mill Creek, adding to the difficulty of improvement through construction.

The issue to be considered on these appeals is, generally, valuation of the condemned properties. The main appeals are by the City of New York. The city's claim is, in essence, that the trial court's awards were excessive. This argument is based upon the city's assertions: (1) that the trial court erred in its finding of the highest and best use of the property; (2) that the trial court erred in not penalizing the claimants, in the awards, for mapped, but undeveloped, "paper" streets running through their properties; (3) that the trial court erred when, after determining that the high-

est and best use of the property was junkyards, etc., it utilized improved, industrial properties as comparable sales to determine its awards; (4) that the trial court erred in determining its awards by averaging the appraisals of the experts; and (5) that the trial court erred in determining that subsurface conditions should be disregarded.

There are cross appeals by two claimants considered herein as well. One is by the Linden Country Club, Inc., in which it is contended that the trial court erroneously omitted certain factors from its computation of Linden's damage award. The other is by William A. Gull, as trustee, who contends that the trial court used insufficient adjustment factors (increments) in its calculations and thus arrived at an award below that which should have been given.

It is not in dispute, and it is a commonly accepted criterion of valuation in condemnation, that the landowner is entitled to be compensated for his loss based upon the use of his property which would yield the highest market value (see, generally, 4 Nichols, Eminent Domain [3d ed], § 12.314). Market value is based upon a determination of what a willing buyer would pay a willing seller for the property in the market existing at the time of the taking (id., § 12.2, subd [1]). Uses of the property which are entirely speculative or prospective are, axiomatically, not properly considered, unless they are so imminent that they would have a bearing upon the appropriate market (id., § 12.314). The resulting standard of valuation is referred to as the land's "highest and best use."

The trial of this matter lasted over a period of many months and produced a plethora of testimony. At odds were the city's expert appraiser and several such experts testifying on behalf of the claimants. The opposing views may be summed up in the words of two such witnesses.

Jerome Haims, for the city, defined the highest and best use as "the range of uses permitted in the zoning with a view toward development or improvement." In his opinion, "limiting these uses to only yard activities, diminishes its full potential, which does not reflect the realities of the marketplace." Haims stated that "[t]he reality of the marketplace is that the former marginal user which purchased a

lot of this land in bulk has been selling it and giving it up for the improved uses." When asked specifically, however, whether he rejected automobile salvage and contractors' equipment uses as being the highest and best uses of the subject parcels, he stated that he did not reject them "per se", and that he considered each an "interim use." "It was here as a result of old purchases when the land was cheap and suited itself to open yard uses. But when you consider the full spectrum of potential, and the marketing and subdividing of this land for industrial development and sale to users, it is obvious to me from a vision of the marketplace what can happen." Mr. Haims then offered the trial court the following:

"I think a prime example of what can happen is the Ohrbach's situation. There it was an auto salvage business—an auto salvage yard—and it was subsequently improved because, as I stated earlier in my history, these marginal areas happen to be well located at the same time they have many attributes, such as highway network, access to bridges, nearness to market, nearness to the metropolitan area. Some have rail transportation available to it. They all have good labor market surrounding it.

"So that the marketplace has, as of the vesting date, the marketplace had caught up with this bypassed land, and the reality of the marketplace indicates that demand for this land for improved uses had materialized."

When asked whether he considered the planned improvement on the subject parcels to be the highest and best use thereof notwithstanding the fact that the cost of fill, piling and sewer and road construction would decrease valuation, Mr. Haims stated that his consideration was not directed to what the present use of the property was, but instead what use, in his "experience in doing appraisals", would be best able "to get value, to get a price, to sell the land in the marketplace", and in his opinion, this use was "development".

Donald McCausland, one of the several appraisers representing the various claimants, disagreed with Mr. Haims. As did Haims, McCausland recognized the superlative location of the subject properties for commercial use considering their proximity to major arteries and thoroughfares

in the city. He also noted, however, that these properties were zoned M-1 and M-3, that such zoning permitted noxious uses not permitted elsewhere and that properties so zoned were becoming a rarity in the city. He stated that there was a need for salvage yards, for areas to store construction equipment and for asphalt plants.

Mr. McCausland defined highest and best use as "that use which returns the greatest economic return to the land." He stated that in his opinion as of December 1, 1972, the vesting date, the highest and best use of the properties he appraised was storage of salvage parts for automobiles or heavy construction equipment, noting that these are permitted uses and that the only construction necessary for such uses would be an opaque fence around the properties' perimeters. Mr. McCausland explained further:

"[T]he use [sic] to which [the subject parcels] were devoted are an integral part of multi-million-dollar industries. The heavy construction industry in the City of New York. They are the basis from which all other construction flows. They are required—contractors need large amounts of open space for the heavy equipment, for their framing of materials, for their steel beds, for streets, for storage in case of asphalt plants for materials for the batching plants.

"Each parcel that I appraised under such conditions was being utilized 100 percent and in my opinion, there was no greater return to the land than the use to which it was being put. It was in the concept of a total industrial use * * *

"The fact that it was open, level land. It was zoned, the proper zoning was M3 or M1. It was close to all sorts of supply and demand and that the owner users were people in the heavy construction business or auto salvage parts which needed open space and the land required absolutely no treatment to use it as such * * *

"Because in the City of New York there are approximately eight and a half million people and a like amount of vehicles, all requiring repair, replacement, salvage, demolition, areas where they are pressed into scrap metal and transported elsewhere. That these again are a vital part of the automotive business and that the locations of the prop-

erty and again the M3 zone to me was the greatest economic return to the land."

All of the experts utilized the comparative sales method for evaluating the condemned properties.

Mr. Haims premised his calculations upon his theory that the land's salvation was in improvement only, which included filling and piling and the construction of roadways before buildings could be constructed per specifications provided by the city. The other experts premised their calculations on their belief that the highest and best uses of the properties were those uses to which the parcels were being put when they were condemned. In the main, the properties used by the several experts for comparison with those which were condemned herein were similar and their values were adjusted by each appraiser. Not surprising then was the fact that after making deductions for upgrading of the subject parcels for construction purposes and allowing only one fourth of his unit valuation for property lying in the beds of mapped, but as yet undeveloped, streets, Mr. Haims' individual valuations and suggested damage awards, as well as his per unit valuations, were considerably less than those arrived at without such extensive deductions by the claimants' experts.

As may be seen, the testimony adduced at trial by the adverse parties was antithetical and presented one clear overriding question of fact to be determined by the trial court, the determination of which would dictate the resolution of other factual issues, i.e., whether the highest and best use of the subject parcels was the industrial park proposed by the City of New York or the uses to which the properties were being put when they were condemned. It is our opinion, as it was that of the trial court, that on this issue the evidence preponderates in favor of the claimants. The testimony offered by the claimants' experts was that the uses in existence on the vesting date were vital to certain types of businesses operating in the metropolitan area and that such uses were not permitted in many areas of the city. This made the subject parcels unique and endowed them with an inherent value which would be lost by the city's proposed use thereof. In addition, as they were

being utilized, generally, the subject parcels required no special buildings, no fill, no piling and no additional roads. A diminution in value of certain portions of the subject parcels because they fell within the boundaries of mapped, but unconstructed roads, as theorized by the city's expert, was unnecessary, because being used as they were on title vesting day, these areas were used in common with the remaining land and absent any actual road construction, easement, prior condemnation or dedication for road use, an award in condemnation for such portions of the claimants' properties must necessarily have been the same as that given for the remainder of the land (see *Matter of City of New York [Sharnack]*, 23 AD2d 687). While under Haims' calculations a diminution of certain areas of land was necessary so that he might place a higher value on the areas which were actually to be improved with industrial edifices, under the claimants' theory of valuation no such diminution was necessary, and the parcels could be valued generally at a higher figure than that arrived at by Haims. We cannot accept the city's argument that the trial court erred in its acceptance of the theory of valuation suggested by the claimants' experts and in its rejection of Haims' testimony in this respect.

It is urged by the city that *Matter of City of New York (Sharnack) (supra)* is inapposite to the instant case and that *Matter of City of Rochester (Hennen)* (56 AD2d 719) requires that a reduced award be given for land lying within the beds of mapped, paper streets.

In *Sharnack (supra)*, the City of New York condemned certain property for street use. Theretofore, these parcels were included on the city map as "paper" streets only, and had no easement or other encumbrance upon them. This court held (p 687) that in such circumstances, the owner was entitled to compensation "on a full fee basis."

In *Hennen (supra)*, a property was condemned. The trial court withheld an award of damages for a 14-foot strip of land abutting a street upon which building was prohibited without permit by section 35 of the General City Law, as this strip was reserved for street-widening purposes. The Appellate Division, Fourth Department, reversed that por-

tion of the judgment which denied such award and directed that the owner be compensated for this loss as well. It held that though the City of Rochester had the right, by ordinance, to restrict building upon a piece of property in the anticipation of laying its streets, the ordinance could not be used as a substitute for condemnation proceedings or to avoid paying just compensation for the property once it is actually taken. The Fourth Department concluded (56 AD2d, at p 720) that "[s]ince the city appropriated all of respondent's parcel including the 14-foot street-widening reservation, the trial court erred in severing the 448 square foot frontage and ascribing no value to it." As to the valuation of such land, the Fourth Department stated (p 720): "Because there is no evidence in the record to support a discount from the per square foot * * * frontage, the judgment * * * is modified upward * * * to reflect the appropriation [of the entirety of claimant's property, including the 448 square feet omitted by the trial court]."

It is the city's contention that *Matter of City of New York (Sharnack)* (23 AD2d 687, *supra*) "merely stands broadly for the proposition that where a grantor has provided other access routes to the grantees in his subdivision, planned streets on a City map do not preclude full compensation for the land in those streets" and that *Matter of City of Rochester (Hennen)* (56 AD2d 719, *supra*), allows a diminution of a condemnation award where the affected property is burdened with such a restriction where there is proof of diminution of value. As hereinabove indicated, it is the belief of the city and its expert that construction of the "paper" streets in question is necessary in order that the remaining land may have the value placed upon it by Mr. Haims and that without these roadways, there would be no access to inside lots.

We think the city is wrong. *Sharnack (supra)* and *Hennen (supra)* are both very clear in their pronouncements. The former holds that absent some existing easement over a mapped but unbuilt and undedicated roadway, the owner of the land so situated is entitled to full compensation therefor. While the latter case offers a similar holding, it adds the sentence with regard to valuation of such a parcel. While it might be said that mere access ways are of less value than

the property surrounding them, we think that the city misses the point. The properties herein involved were at the time of condemnation accessible without the need for improvement of the "paper" streets and, by reason of the highest and best use found by the trial court, there was no need to build on the paper streets or to construct the roadways so designated because there was sufficient access to continue the then present use and storage could take place directly upon the portions of the properties lying in the beds of the mapped streets. It appears that when the Fourth Department noted the absence of factors requiring a lesser award for the 14-foot strip in question in *Hennen (supra)*, it was speaking to a valuation of the property separate and apart from the remainder, i.e., a reason for valuing it at a figure less than that attributed to the surrounding property. A fortiori, it found that the restriction imposed by the city ordinance limiting building on that property and the proposed use of the property for street-widening purposes was not a *quid pro quo* for reducing the valuation of that property. Thus, quite to the contrary of the city's argument, *Hennen (supra)* supports the trial court's decision in this respect.

We have examined each of the damage awards placed into question by the city in detail and, except as is hereinafter indicated, hold that they are consistent with the proof adduced at trial and that they do not constitute a mere compromise between the awards suggested by opposing experts.

In its cross appeal, Linden Country Club asserts that the trial court erred by excluding from its damage award an amount for financing charges and real property taxes paid during the period of construction as a legitimate item of computation in the replacement cost of its specialty structure, a beach and country club.

■ Though it is now settled that finance charges and real property taxes paid during the period of construction are compensable in condemnation where, as in the case of the Linden Country Club, the summation or replacement method of valuation (reproduction less depreciation) is utilized for determining the amount of the damage award

*(Matter of City of New York [Salvation Army]*, 43 NY2d 512), it is not all that clear from the record on appeal that, as Linden asserts, the trial court did not include these items in its award. While Linden is correct in its assertion that the trial court expressed its doubt as to whether it should include these items in its award, as Linden also points out, nowhere in the trial court's 101-page opinion is this issue addressed. The arithmetic machinations indulged in by Linden do not convince us that in the final analysis the trial court did not agree with its assertions. Significantly, our comparison of the trial court's award with the appraisals offered by the adverse experts reveals that the award given to Linden must necessarily have included amounts for these items. We have no record upon which to base a determination in Linden's favor on this issue. Indeed, though the trial court was considering objections to the decree herein appealed from at a time when the Court of Appeals was hearing and readying its decision in the determinative case in this area *(Matter of City of New York [Salvation Army]*, *supra)*, and despite the fact that Linden's counsel herein also represented the claimant in *Salvation Army* before the Court of Appeals, it is undisputed that Linden failed to make any postdecree protest of its award on this ground or to seek clarification of the decree in this respect. While we agree with Linden that no party to a litigation has a duty to seek postjudgment relief, where a record on appeal is unclear as to the point in issue and the basis for a claim on appeal is pure speculation which is dispelled by the appellate court's scrutiny of the record, we think that the absence of such a postjudgment, preappeal protest at nisi prius should accrue to the detriment of the party asserting the claim.

In the remaining cross appeal, claimant William A. Gull contends that the trial court erred in applying only a 15% increment to his parcel, such amount representing 5% for plottage and 5% each for frontage on two city streets.

An increment in zoning award computation is a percentage amount used to increase the land area upon which the award is based and is employed to render additional compensation where there is a quality of the land taken which makes it more valuable with it than without it. These increments are given for, *inter alia*, frontage and plottage. The

former being the fact that the plot abuts one or more streets; the latter being the increased value derived from the joining together of two or more contiguous properties such that the grouping has a greater value as a single unit than as individual lots (see 4 Nichols, Eminent Domain [3d ed], § 12.35). Though, as the trial court observed, the increment awarded for frontage is generally 5% per street, and the increment awarded for plottage is generally 10%, these figures are only approximations of what will or may ordinarily be awarded, there being no hard and fast rule (see 4 Nichols, Eminent Domain [3d ed], § 12.35; 1 Orgel, Valuation Under Eminent Domain [2d ed], § 35; *Matter of Erlanger*, 237 NY 159). Actual increments may vary depending upon the circumstances involved. As the trial court correctly observed, there reaches a point at which the increased size of a parcel diminishes its value, and as a result, the increment awarded for plottage in such circumstances would be less than the usual 10% figure. The subject parcel is very large (Damage Parcels Nos. 138-147, total area, 519,898 sq ft; Damage Parcels Nos. 148-149, total area, 33,102 sq ft). Gull's appraiser considered the entire plot as a single unit and ascribed 15% increments for both plottage and frontage, for a total of 30% in increments. The city's appraiser calculated his appraisal differently. Considering Damage Parcels Nos. 138-147 as a single entity, he determined that an increment of 10% for plottage and 5% for frontage should be given. The remaining Damage Parcels taken from claimant Gull, Nos. 148-149, considered as a single unit, were given a 5% increment for plottage and a 10% increment for frontage. In its original award, the trial court utilized a 20% increment for the larger parcel and a 13% increment for the smaller parcel, stating that it considered these to be apportioned 10% for plottage and the remainder of each for frontage. Following a hearing on objections at which Gull (represented by the same law firm which represented claimant Linden Country Club) protested the fact that the trial court valued his land as two parcels, the trial court reconsidered what it had done and, thereafter, considering the entire parcel as a single entity, and, as a result, of lower value, applied an increment of 5% for plottage and 10% for frontage (5% for each of two

frontages), for a total of 15%, erroneously pointing out that this amount was within the range suggested by the city's expert.

■ We think that the trial court erred as Gull contends it did. Though it may be that as a property increases in size beyond a certain point, it diminishes rather than increases in value (see 1 Orgel, Valuation Under Eminent Domain [2d ed], § 35), nevertheless, a condemnation award must be based upon the evidence adduced at trial and not upon the fact finder's conjecture (see *Lawyers Co-op. Pub. Co. v State of New York*, 47 AD2d 122). In valuing the larger parcel, the city's expert thought that a 10% increment for plottage was appropriate; Gull's expert considered the whole as a single entity and ascribed a 15% increment for plottage. In view of this, we are unable to agree with the trial court's conclusion that the addition to this parcel of another parcel which had a land area of less than 7% thereof would be so catastrophic as to require a 50% reduction in the increment for plottage of which, initially, the two experts and the trial court had approved. The increment for plottage should have been held at 10% by the trial court. Furthermore, it appears that the subject parcel fronts on three streets. At 5% per street, an increment of 15% for frontage should have been utilized by the trial court in formulating Gull's award. Its failure to do so is not supported by any explanation in its several memoranda herein and appears to be the result of an oversight, the trial court having specifically referred to this property as only having double frontage.

· In view of the evidence adduced at trial and absent any explanation for the decision in this respect which is supported by the trial record, we conclude that an incremental increase of 25% in the calculation of the Gull damage award is necessitated. Accordingly, we fix the award in the Gull matter as follows:

| | |
|---|---|
| Total land area of damage parcels 138-149, inclusive | 553,000 sq ft |
| plus 25% | 138,250 sq ft |
| Total | 691,250 sq ft |
| | x $5.75 |
| Total award | $3,974,687.50 |

With the exception of the above upward adjustment in the award for Damage Parcels Nos. 138-149 inclusive, the decrees should be affirmed insofar as they are herein appealed from, without costs or disbursements.

HOPKINS, J. P., MANGANO and GIBBONS, JJ., concur.

Fourth separate and partial supplemental final decree of the Supreme Court, Queens County, dated August 8, 1978, modified, on the law, by increasing the award to William A. Gull, as trustee, for Damage Parcels Nos. 138-149, inclusive, to $3,974,687.50. As so modified, decree affirmed insofar as appealed from, without costs or disbursements. Second supplemental fourth separate and partial final decree of the same court, dated October 5, 1978, affirmed insofar as appealed from, without costs or disbursements.